**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No.  3:02-cr-44 |
| | ) | |
| Michael Sean Gianakos, | ) | **ORDER DENYING MOTION** |
| | ) | |
| Defendant. | ) | |

_____

Before the Court is Defendant Michael Sean Gianakos's motion pursuant to 28 U.S.C. §
2255.  He alleges two instances of ineffective assistance of counsel at his trial.  The United
States resists the motion.  For the reasons explained below, the motion is denied.

I.      **BACKGROUND**

In January 1997, the Defendant was employed at the Super 8 Motel in Moorhead,
Minnesota.  At that time, he lived with his girlfriend, Jamie Dennis.  On January 27, 1997, the
Defendant and Jamie staged a robbery at the Super 8 Motel and stole some money.  Anne Camp
was a potential witness against Gianakos and Jamie in this staged robbery because she was
babysitting for them the night of the robbery.

On January 28, 1997, the Defendant confessed that he and Jamie had been involved in the
staged robbery of the Super 8 Motel.  On January 29, 1997, Anne Camp was interviewed by law
enforcement about the night of the staged robbery.  The Defendant and Jamie were concerned
that Anne Camp had given a statement to law enforcement.  They did not want Jamie to be
convicted given that Jamie was on probation for another offense at the time of the robbery and
thus a long prison term was possible.

1

On February 14, 1997, the Defendant married Jamie in Moorhead, Minnesota. Anne Camp was the maid of honor. John Murack was the best man. The Defendant stated in a videotape recorded interview that the reason they got married was so they could not testify against each other. He testified in the state trial that a part of the reason they got married was so they could not testify against each other. The Defendant also told his father, George Gianakos, that this was a reason they got married. Jamie initially stated that their marriage was a sham but recanted that testimony.

In late February 1997, both the Defendant and Jamie were charged with theft of money from the Super 8 Motel. Jamie testified their plan was to lure Anne Camp to an abandoned farmstead and try to convince her that she was confused and that her statement to law enforcement was not accurate. The Defendant was familiar with the abandoned farmstead because he had been there before with his friend, Gerald Gould. Prior to the murder, Jamie had never been to the farmstead.

On May 1, 1997, Gianakos purchased a 12-gauge shotgun at a pawn shop near his home. The Defendant testified in federal court that he purchased the shotgun at the request of Jamie as a means of personal defense during his expected incarceration on the robbery conviction. Jamie purchased the shotgun shells at Wal-mart just prior to the purchase of the shotgun. They also purchased wine coolers and sleeping pills that same day. The Defendant crushed up the sleeping pills and put them into the wine cooler.

Jamie testified as follows: After purchasing the shotgun, the Defendant and Jamie, with their two young children, picked up Anne Camp at her apartment in Fargo, North Dakota, under the pretense of showing Anne some farm land near Sabin, Minnesota, they were thinking about

purchasing.  As they drove to the abandoned farmstead, Jamie handed Anne the wine cooler laced with the sleeping pills.  After driving for a while to allow the drugs and alcohol to take effect, they arrived at the abandoned farmhouse.  Anne and Jamie took the kids and walked into the farmhouse.  About ten minutes later the Defendant yelled from outside that they needed to get going.  As Anne and Jamie walked out, the Defendant came up from behind the farmhouse and fired the shotgun toward the back of Anne's head and she fell to the ground.  They put on latex gloves. Each taking one leg, they dragged Anne's body behind the farmhouse.  The Defendant then asked Jamie to get the knife in the car and slit Anne's throat, but Jamie refused. Jamie went to the car as instructed and while sitting there she saw the Defendant standing over Anne.  He then shot her in the face.  With blood on his face and jacket, the Defendant got into the car and they drove home.  Upon arriving home a tooth and some blood were discovered on one of the Defendant's shoes.  Michael then went over to his parent's home.

There was no physical evidence of a shotgun wound to the back of Anne Camp's head. The physical evidence was that of one devastating shotgun wound to left side of Anne Camp's face delivered at very close range.  No definitive cause of death could be established from the physical evidence.

On May 7, 1997, Anne Camp's body was found by a farmer at the abandoned farmstead. Another farmer, who lived near the abandoned farmstead where Anne Camp's body was found, testified he saw a car pull into the abandoned farmstead around 9:30 p.m. on May 1, 1997.  He further testified he heard one gunshot a few minutes after the car pulled into the abandoned farmstead.  After the crime scene was processed, the body was taken for an autopsy.  The initial autopsy revealed the cause of death was cerebral laceration/destruction due to a gunshot wound

to the head.  There was a laceration to the throat but it was not a fatal wound.  The manner of death was homicide.

The Defendant pled guilty to his role in the theft from the Super 8 Motel on May 9, 1997, and was sentenced on June 13, 1997, to sixty days in jail.  Jamie was found guilty at trial of the staged robbery in January 1998.  During this trial Gianakos lied about Jamie's involvement in the robbery in an effort to keep her from going to prison.

Early on in the investigation, law enforcement identified several suspects including Andy Betrosian and Bryan Albertson who were former boyfriends of Anne Camp.  Betrosian and Camp had a child together and there was testimony that Betrosian abused Anne Camp during their relationship.  After an investigation the two men were eliminated by law enforcement as suspects.

Through 1997 and into 1998 the investigation continued.  The investigation was basically at a standstill until September 1998.  In early September 1998, the Defendant's parents, George and Alice Gianakos, contacted the Clay County Sheriff's department.  On September 7 and 9, 1998, they were interviewed.  During this interview, George and Alice told officials they had received a telephone call from their son, who was quite upset, and that he claimed to have read details of the murder in one of Jamie's diaries or notebooks.  The details included that Anne had been shot in the face, her throat slit, and that she had been drugged.  At the time, the fact that Anne's throat was cut was not public knowledge.  The fact she was drugged was unknown to law enforcement and had gone undiscovered in the autopsy.  The apartment the Defendant and Jamie were living in was searched on September 9 and 10, 1998.  The diary was never found.  Jamie testified she had never written a diary with details of the murder as described by the Defendant.

4

After the Defendant told his parents that Anne had been drugged, further toxicological testing confirmed that she ingested a potentially lethal dose of doxylamine succinate, an active ingredient in sleeping pills.  With this new information, the cause of death was revised to show that the gunshot wound and the poison were competing with for one another as a principle cause of death.  The manner of death remained homicide.

From September 1998 until June 1999, the investigation focused on the Defendant and Jamie but remained at a standstill.  Jamie's probation was revoked on June 11, 1999, for her role in the Super 8 robbery.  All of Jamie's telephone calls from prison were recorded.  Law enforcement obtained a wiretap for the Defendant's home phone on September 15, 1999, and implemented a plan to generate conversation between the Defendant, Jamie, and others.  Numerous conversations were recorded, a number of which were played at trial.

While incarcerated, Jamie became acquainted with fellow inmate Linda Bay.  Bay contacted law enforcement on October 21, 1999, with information regarding the murder of Anne Camp.  Bay provided detailed information regarding the murder which she had obtained from Jamie.  The information included the purchase of a 12 gauge shotgun by the Defendant on the day of the murder.  Law enforcement was unaware of the Defendant's purchase of the shotgun prior to talking to Bay.  On October 28, 1999, Gerald Gould contacted law enforcement and told them he had been out the abandoned farmstead where Anne Camp's body was found with the Defendant in 1993.

Based upon the information provided by Bay and the recorded telephone calls, a Minnesota grand jury indicted both the Defendant and Jamie for the murder of Anne Camp on October 27, 1999.  Jamie cooperated, pled guilty to second degree murder, testified against the

Defendant at trial, and eventually received a 25-year sentence.  In May 2000, the Defendant was convicted of first degree murder and sentenced to life in prison.  He appealed, arguing a violation of the Minnesota marital privilege statute. Minn.Stat. § 595.02, subd. 1(a).  In <u>Minnesota v. Gianakos</u>, 644 N.W.2d 409 (Minn. 2002), the Minnesota Supreme Court reversed the conviction.  The opinion was dated May 23, 2002.  In construing the Minnesota marital privilege statute, the court declined to adopt either a sham marriage or joint participant exception. <u>Id.</u> at 416.

On July 19, 2002, a federal grand jury in the District of North Dakota returned a four-count indictment against the Defendant, charging him with conspiracy to commit kidnapping with death resulting, in violation of 18 U.S.C. § 1201(c); kidnapping resulting in death in violation of 18 U.S.C. § 1201(a)(1); using or carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1); and causing death by use of a firearm in violation of 18 U.S.C. § 924(j)(1).

Counts one and three were dismissed by the return of a two-count superseding indictment against the Defendant.  He entered a plea of not guilty to the superseding indictment.  On May 9, 2003, after an eight day trial and two days of deliberations, a jury found the Defendant guilty of kidnapping with death resulting, in violation of 18 U.S.C. § 1201(a)(1).  The jury was unable to reach a verdict on the charge of causing death by use of a firearm and that charge was ultimately dismissed by the Court.  The Defendant was sentenced to life imprisonment.  He remains incarcerated at the United States Penitentiary in Florence, Colorado.

The Defendant appealed his conviction to the Court of Appeals for the Eighth Circuit, raising the following issues: (1) the District Court should not have admitted the Defendant's prior testimony from state court proceedings at trial; (2) the District Court erred in refusing to

instruct the jury with regard to the offense of accessory after the fact; (3) the District Court erred in failing to adequately address juror misconduct; (4) the District Court abused its discretion by excluding certain audiotapes; and (5) the evidence was insufficient to convict.

The Eighth Circuit rejected the Defendant's arguments and affirmed his conviction in an opinion dated July 26, 2005. United States v. Gianakos, 415 F.3d 912 (8th Cir. 2005). He subsequently applied for a writ of certiorari to the United States Supreme Court, which was denied on November 28, 2005. Gianakos v. United States, 126 S.Ct. 764 (2005).

The Defendant next filed a motion pursuant to 28 U.S.C. § 2255 with the United States District Court on November 27, 2006. In his motion, he raised the following grounds for habeas corpus relief: (1) the District Court erred in failing to determine whether Jamie Gianakos's testimony was voluntary in light of her acceptance of a plea agreement; (2) ineffective assistance of counsel; (3) the District Court erred in admitting prior testimony from the Defendant's state trial; (4) juror misconduct; (5) the District Court erred in admitting prior testimony and transcripts from the Defendant's state court proceedings which were held inadmissible by the Minnesota Supreme Court at the Defendant's state trial; and (6) Government misconduct. He requested relief in the form of a new trial.

On December 4, 2006, the District Court appointed counsel, Carey A. Goetz, to assist the Defendant with his application for relief under 28 U.S.C. § 2255. The Defendant was represented by attorney Richard Henderson during his trial in federal court pursuant to an appointment under section 18 U.S.C. § 3006A of the Criminal Justice Act. Mr. Henderson also represented the Defendant in his direct appeal to the Eighth Circuit and application for a writ of certiorari to the United States Supreme Court. The matter has now been fully briefed and is

7

ready for consideration.

## II.    EVIDENTIARY HEARING

The Defendant has requested an evidentiary hearing.  The Government is opposed.  The record in this case is well-developed.  The Court's attention has not been drawn to any foggy area in the record which an evidentiary hearing might illuminate.  The Court is of the opinion that an evidentiary hearing is unnecessary for the full consideration of the issues raised by the motion.  The request will be denied.

## III.   DISCUSSION

A motion made pursuant to 28 U.S.C. § 2255 requires a showing of either constitutional or jurisdictional error, or a "fundamental defect" resulting in a "complete miscarriage of justice." Davis v. United States, 417 U.S. 333, 346 (1974); Hill v. United States, 368 U.S. 424, 428 (1962).  A section 2255 motion is not a substitute for a direct appeal and is not the proper way to complain about simple trial errors. Anderson v. United States, 25 F.3d 704, 706 (8th Cir. 1994). A section 2255 movant "must clear a significantly higher hurdle than would exist on direct appeal." United States v. Frady, 456 U.S. 152, 166 (1982).

### A.    INEFFECTIVE ASSISTANCE OF COUNSEL

It is well-established that a defendant's ineffective assistance of counsel claim is properly raised under 28 U.S.C. § 2255 rather than on direct appeal. United States v. Davis, 452 F.3d 991, 994 (8th Cir. 2006).  The burden of demonstrating ineffective assistance of counsel is on a defendant. United States v. Cronic, 466 U.S. 648, 658 (1984); United States v. White, 341 F.3d 673, 678 (8th Cir. 2003).  To be eligible for habeas relief based on ineffective assistance of counsel, a defendant must meet the two-part test announced in Strickland v. Washington, 466

8

U.S. 668, 687 (1984).  A defendant must first establish that counsel's representation was constitutionally deficient, which requires a showing that counsel's performance fell below an objective standard of reasonableness. Id. at 687-88; see also Wiggins v. Smith, 539 U.S. 510 (2003).  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Strickland v. Washington, 466 U.S. 688, 687 (1984).  In considering whether this showing has been accomplished, "[j]udicial scrutiny of counsel's performance must be highly deferential." Id. at 689.  If the underlying claim (i.e., the alleged deficient performance) would have been rejected, counsel's performance is not deficient. Carter v. Hopkins, 92 F.3d 666, 671 (8th Cir. 1996). Courts seek to "eliminate the distorting effects of hindsight" by examining counsel's performance from counsel's perspective at the time of the alleged error.  Id.

A defendant must also show that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984).  This requires proving that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been more favorable to the defendant. Id. at 690-91.  A reasonable probability is one "sufficient to undermine confidence in the outcome." Wiggins v. Smith, 539 U.S. 510, 534 (2003).  Merely showing a conceivable effect is not enough.  When evaluating the probability the result would have been different, a court views the alleged error in light of the totality of all the evidence before the jury to gauge the effect of the error. Kimmelman v. Morrison, 477 U.S. 365, 381 (1986); Williams v. United States, 452 F.3d 1009, 1013 (8th Cir. 2006).

Where a defendant raises multiple claims of ineffective assistance, each claim of ineffective assistance must be examined independently rather than collectively. Hall v. Luebbers,

296 F.3d 385, 692-93 (8th Cir. 2002); <u>Griffin v. Delo</u>, 33 F.3d 895, 903-04 (8th Cir. 1994).

**1.      JUROR MISCONDUCT**

The Defendant argues that defense counsel failed to object to the Court's admonition and failed to timely move for mistrial.  He claims the Court's admonition effectively denied him a fair trial and impartial jury in violation of the Sixth Amendment.

At the close of the fourth day of trial an incident regarding one of the jurors was brought to the attention of the Court.  This incident was discussed with counsel and the next morning the following record was made.

> [THE COURT]:  As I understand it, Detective Green was watching the jury during one of the playbacks of a telephone call and believes that he saw one of the jurors turn to another juror and appear to mouth the statement, quote, he's guilty.  Close quote.  And, Detective Green, is that in effect what you noted or believe you noted?
>
> [MR. GREEN]:  That's correct.
>
> [THE COURT]:  No hearing; just lip reading?
>
> [MR. GREEN]:  I did not hear.
>
> [THE COURT]:  All right.  And you, of course, notified counsel, who, I think, in an excess of caution proceeded to notify defense counsel and notify me.
>
> I don't consider this a matter of great significance.  I have a feeling that every jury that's ever been empaneled reaches some conclusions at some point of the case.  I will, however, make this record just to establish that this did occur and that it was brought to our attention, and I will chew on them [the jury] when I send them home tonight, once again emphasizing the admonition to maintain an open mind until all of the evidence is received, and further pointing out that should someone have reached a conclusion that no amount of defense testimony could change a conclusion as to guilt or innocence, then, for God's sake, keep it to yourself until the matter is submitted to the jury for deliberation.  And that's basically my intention.
>
> [DEFENSE COUNSEL]:  Your Honor, I would request that you do give a very detailed admonition to the jurors, and with no disrespect intended to the

Court at all, I think some people could interpret the way that you've been repeating the admonition as almost kind of winking at the admonition, and I would request, first, that the Court inform the jurors that it's very important not to talk about the evidence....The other thing that I-and this is just a matter of style, and I'm trying to tread lightly here.  The other thing that I would request is that you ask the jurors if anyone has made any comments to you that you felt were inappropriate, that you could advise the bailiff of that, and that it would be a responsible thing for a juror to do.  There have been cases of jurors, you know, who have kind of lobbied during the trial, trying to lobby other jurors to, you know, reach a conclusion.  I don't want that to happen here.  So I think it would be appropriate to tell them that if you feel that someone's trying to communicate with you inappropriately, you can advise the bailiff of that, and just leave it at that.

[THE COURT]:  I would be glad to say that for someone who's not on the jury.

[DEFENSE COUNSEL]:  Well, even if a member of the jury was trying to engage other jurors in a discussion of the case at this point, that would be inappropriate and it would be the right thing for the juror to do, to advise the bailiff so the Court could inquire further.

[THE COURT]:  Very well.

(Tr. 513-17).

Upon conclusion of day five of the trial, the Court issued the following admonition to the

jury:

[THE COURT]:  Members of the jury, we're going to break now for the weekend, and it becomes really critical that if someone asks you what the case is about, don't tell them, because I don't want you recounting testimony or explaining the parties' positions because that might fix one version or one set of facts in your mind to the detriment of the defense, who have not yet been able to put on the full case.

So I'm going to say to you, again:  Don't talk about the case or anyone connected with it until I finally chase you off to the jury room to decide the matter.  And if, based on the testimony you've heard so far, any one of you has reached a conclusion as to guilt or innocence and decided that there's no way that can be shaken, if that's happened, don't share it with anybody, unless and until you finally get into the jury room to decide the case; and then that's the time to share those convictions and beliefs.  So you're leaving for the weekend, so the

11

previous admonition of the Court is reinforced and made stronger.

(Tr. 645-46).

Defense counsel did not object to this admonition. At the conclusion of the trial but before the Court had given the jury its final instructions and closing arguments had been presented the issue was revisited.

> [DEFENSE COUNSEL]: There is a juror-I think it's juror number 4-... who made the comment that we believe-where she mouthed the words, "he's guilty" last week during trial ....We request that that juror be dismissed. We have an alternate juror. I think that juror has shown prejudice, and there is cause to dismiss juror number 4 and have her replaced by the alternate at this point. And we formally move the Court for that relief.

> [THE COURT]: Does the government have any position on that? I don't know. It's – I'm not sure that's what happened. It's what the detective indicated he believed he thought he saw.

> [PROSECUTOR]: We would oppose that motion, Your Honor. This has been addressed earlier by the Court. We'll leave it at that.

> [THE COURT]: Why don't you couple that comment in the alternative, just, again, to protect yourself and protect the record, with a motion for mistrial, if not granted.

> [DEFENSE COUNSEL]: Okay. Your Honor, if the Court does decide not to dismiss juror number 4, we do ask for a mistrial.

> [THE COURT]: Very good. And now your record is protected on that point, as well.

(Tr. 1211-12)

### a.    Reasonableness of Representation

The fist prong of the ineffective assistance analysis requires a showing of deficient performance by counsel. The purpose of a claim of ineffective assistance is not to grade the efforts of counsel. Strickland, 466 U.S. at 696. A Court need not address the issue of the

reasonableness if, as in this case, the Defendant has failed to establish prejudice. Id.

    **b.**    **Prejudice**

The second prong of the ineffective assistance analysis requires a showing of prejudice. The Court must consider the totality of the evidence in assessing whether there is a reasonable probability the Defendant would not have been found guilty if defense counsel had objected to the Court's admonition. See Kimmelman, 477 U.S. at 381; Cagle, 474 F.3d at 1095.

The Defendant argues the Court's admonition shifted the burden of proof thereby prejudicing him. The Defendant relies primarily upon a 2-1 opinion from 1945 to support his argument. Winebrenner v. United States, 147 F.2d 322, 329-30 (8th Cir. 1945)(wherein the Court's admonition was deemed to have permitted premature deliberations which were found to have shifted the burden of proof without any actual showing of prejudice). He also cites the dissenting opinion from his direct appeal. Gianakos, 415 F.3d at 930 citing Winebrenner, 147 F.2d at 328. The dissent in Gianakos is not controlling. Winebrenner was decided long before Strickland and was a direct appeal. The matter now under consideration is a collateral attack pursuant to 18 U.S.C. § 2255. In Winebrenner the trial lasted seven weeks and the admonition in question was given on the second day of trial and prior to many weeks of the Government presenting its case. In the present case, the admonition in question was given at the end of the fifth day of trial, after the Government had rested its case and after the defense had called five witnesses. The trial lasted roughly eight days and the jury deliberated for two full days before reaching its unanimous verdict.[1]

It should also be remembered that the Court repeatedly admonished the jury not to talk

---

[1]The Defendant was found guilty in his first trial as well. Minnesota v. Gianakos, 644 N.W.2d 409 (Minn. 2002).

about the case until they had heard all the evidence.  This was done at every break. (Tr. 72, 120,

172, 196, 275, 338, 387, 407, 460, 464, 469, 502, 513, 594, 698, 752, 813, 870, 946, 1146)  Also,

every juror received a copy of the Court's preliminary and final jury instructions.  No

preliminary instructions were given in <u>Winebrenner</u>. 147 F.2d at 327-28.  Both sets of

instructions in the present case were read to the jury by the Court and each juror had his or her

copy of the preliminary instructions in hand during the entire trial, including deliberations.  The

preliminary instructions contained the following:

> During the course of the trial, you should not talk with any witnesses, or
> with the parties, or with any of the lawyers in the case.  Please don't talk with
> them about any subject at all.  In addition, during the course of the trial, you
> should not talk about the trial with anyone else – not your family, not your
> friends, not the people you work with.  Also, you should not discuss the case
> among yourselves until I have instructed you on the law and you have gone to the
> jury room to make your decision at the end of the trial.  It is important that you
> wait until all the evidence is received and you have heard my instructions on rules
> of law before you deliberate among yourselves.
>
> ***
>
> Do not make up your mind during the trial about what the verdict should
> be.  Keep an open mind until after you have gone to the jury room to decide the
> case and you and your fellow jurors have discussed the evidence.

Preliminary Jury Instructions at p. 12.-13.

Both the preliminary and final instructions made it abundantly clear that the burden of

proof was upon the Government to prove the guilt of the Defendant beyond a reasonable doubt.

Jury instructions must be viewed as a whole rather than in isolation and are not required to be

perfect. <u>Frady</u>, 456 U.S. at 169; <u>United States v. Jenkins</u>, 487 F.3d 564, 580 (8th Cir. 2007).

Moreover, the admonition at issue was never repeated and was largely subsumed by the repeated

proper instructions.

14

There is no evidence or indication that the jurors considered information obtained outside the courtroom or were tampered with during the trial.  Such misconduct is more serious than premature deliberations.  United States v. Terrazas, 190 Fed. Appx. 543, 549 (9th Cir. 2006).  The only evidence of premature deliberations in this case was the one possible inaudible comment reported by Detective Green.  Third party communications regarding the substance of the case are presumptively prejudicial.  United States v. Caldwell, 83 F.3d 954, 956 (8th Cir. 1996).  But that is not the case here.

Strickland, rather than Winebrenner, is controlling.  It is the totality of the evidence that must be considered in making the determination of prejudice.  Kimmelman, 477 U.S. at 381; Williams, 452 F.3d at 1013.  It is interesting to note that the dissent in Winebrenner did not think reversal was warranted as there had been no finding of actual prejudice.  Winebrenner, 147 F.2d at 330.  Prejudice in the context of a claim of ineffective assistance of counsel must be proven and will not be presumed.  Strickland, 466 U.S. at 692; United States v. Klee, 494 F.2d 394, 396 (9th Cir. 1974)(rejecting Winebrenner while noting not every case of juror misconduct requires a new trial and finding the proper test is whether the defendant was prejudiced).

An evaluation of the evidence was first made by the Court shortly after trial.  In ruling on the defense motion for a new trial on December 3, 2003, the Court noted the following in denying the motion:

The evidence against Michael Gianakos was overwhelming:

1.  He purchased a 12 gauge shotgun at a pawn shop shortly before the murder, and participated in the purchase of ammunition, wine coolers and the medication used to poison Ms. Camp.

2.  He was aware of the location and condition of the abandoned farmstead where the killing took place, having participated in the theft of a radiator core from an

15

old truck located on the site several years earlier.

3.  The body of Ms. Camp was dragged along the ground to the place where it was found.  Ms. Camp was a large person and expert testimony opined that someone of Jamie's small size could not have moved the body without assistance.

4.  The recorded telephone conversations–the fact of the recordings being known–contained continued references of "although we are innocent"-"if nobody talks everyone walks."

5.  The bizarre circumstances leading to the shift of the focus of the investigation to the defendant and his wife, that being the defendant's recital of the details of the murder as allegedly contained in the "notebook".  No notebook was found and the details were too accurate to be imagined.

6.  The testimony of Jamie Gianakos, which survived the rigorous and able cross examination of defense counsel and the demonstration of the advantage gained by Jamie through the proffer of testimony against her husband.  Jamie's testimony was quite detailed including the recounting of Michael finding one of Ms. Camp's teeth stuck to his shoe upon arriving home after the killing.

See Docket No. 190.

The Court now adds the following:

1.  No credible connection between Betrosian and Jamie was ever established.

2.  The Defendant and Jamie had collaborated on the Super 8 Robbery.

3.  When the Defendant telephoned his parents, who then contacted law enforcement, regarding the "notebook" the fact that Anne Camp's throat had been cut was not public knowledge and the fact that she had been poisoned unknown to law enforcement and had gone undetected by the medical examiner.

4.  Jamie's testimony was consistent with what she told fellow inmate Linda Bay in October of 1999.

5.  The Defendant knew how to use a shotgun.  Jamie did not.  Yet he testified that although he bought the shotgun for her he did not go with her to show her how to use it. Instead letting her go off with the two small children to a family member's farm to learn how to use the shotgun without him.

The Court's opinion as to the overwhelming nature of the evidence against the Defendant

has not changed. "A verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Strickland, 466 U.S. at 696. This was not a weak case. The evidence of guilt was overwhelming. Prejudice has not been shown. A new trial is not warranted.

### 2.    JURY INSTRUCTIONS

The Defendant's second argument is that his trial counsel failed to request an accessory after the fact jury instruction and failed to object to the Court's modification of the aiding and abetting instruction. The Court's modification of the aiding and abetting instruction was intended to satisfy defense counsel's concerns that the jury would find the Defendant guilty based upon actions taken after the fact which might constitute being an accessory after the fact but which did not constitute aiding and abetting.

There must be evidence to support a proposed instruction before a court is obligated to instruct the jury in the manner requested. United States v. Crawford, 449 F.3d 860, 862 (8th Cir. 2006). In addition, the request must be made in a timely fashion and the requested instruction must be a correct statement of the law. United States v. Whitehead, 176 F.3d 1030, 1037 (8th Cir. 1999). In this case the Defendant was not charged with being an accessory after the fact. He was charged as a principal and with aiding and abetting which requires proof of action taken in furtherance of, and contemporaneously with, the charged offense.

Defense counsel called numerous witnesses at trial. An alibi defense was presented to the jury. An alibi instruction was requested and given. Defendant's Requested Jury Instruction No. 23; Final Jury Instructions at p. 13. The Defendant himself testified that he had nothing to do with the killing of Anne Camp. He testified he was at his parent's home with his father at the

time of her death and thus could not have been involved.  None of the testimony elicited from the defense witnesses or the Defendant himself supported a theory that the Defendant was an accessory after the fact.  The Court would not have given an accessory after the fact instruction even if defense counsel had made such a request.

Defense counsel did make a timely request for an instruction which would have reminded the jurors to consider only the offense charged.[2]  This was in effect a theory of the case instruction.  The first paragraph of the requested instruction was covered in the preliminary instructions.  Preliminary Instructions at p. 1, 4.  The second paragraph was somewhat argumentative.  Instead of giving it, the Court modified the aiding and abetting instruction to make it very clear that any conviction for aiding and abetting must be for actions taken "before or at the time the crime was committed." Final Instructions at p. 6.

The substance of the requested instruction was given, albeit in three different places, and certainly provided defense counsel the opportunity to make the necessary arguments during his closing argument.  Defense counsel did request, and in effect, did receive the requested instruction.  As the instructions given by the Court opened the door as to all potential arguments defense counsel may have wished to make, it was not necessary and certainly not ineffective

---

[2]CONSIDER ONLY THE OFFENSES CHARGED

You are here to decide whether the government has proved beyond a reasonable doubt that Michael Gianakos is guilty of the crimes charged. Michael Gianakos is not on trial for any act, conduct or offense not specifically charged in the Indictment.

Michael Gianakos has not been charged as an accessory after the fact. That you may believe Michael Gianakos helped Jamie Dennis Gianakos after Anne Marie Camp's death, in order to prevent her arrest, trial or punishment does not make him guilty of the crimes charged in the Indictment. In other words, helping or aiding a criminal after the commission of a crime for the purpose of hindering that person's arrest, trial, or punishment, is not the same as committing the crime.

Defendant's Requested Jury Instruction No. 8.  Docket No. 134.

assistance for defense counsel not to have objected.  No opportunity for argument was lost and thus there was no prejudice.  The theory of the case promoted during closing argument is a matter of trial strategy and not subject to second-guessing. <u>Walls v. Bowersox</u>, 151 F.3d 827, 834 (8th Cir. 1998).

Defense counsel succeeded in persuading the Court to modify the aiding and abetting instruction.  This was done in such a way that all can be confident the jury did not erroneously convict the Defendant for actions he may have taken after the fact to conceal the crime.  In addition, the modification kept open all options for closing argument.  In persuading the Court to modify the aiding and abetting instruction defense counsel rendered very able and effective representation to his client.

## IV.    CONCLUSION

It was the overall impression of the Court that the performance of defense counsel at trial was exemplary.  Numerous witnesses were called in support of the defense theory of the case and the Government's witnesses were tested with thoughtful cross-examination.

The Government's case was strong, the evidence of guilt overwhelming.  The Defendant has not proven he was prejudiced.  The Court is convinced that the Defendant did receive a fair trial from an impartial jury and with the assistance of able and competent counsel.

Based upon the entire file and upon the foregoing discussion, it is **HEREBY ORDERED** that:

1.    The Defendant's section 2255 motion is **DENIED** along with his request for an evidentiary hearing.

2    Under 28 U.S.C. § 2253(c)(2), a certificate of appealability may only be issued if the applicant has made a substantial showing of the denial of a constitutional right.  When the court has rejected a petitioner's claim on the merits, the substantial showing required is that the "petitioner must demonstrate that

reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)); see also U.S. v. Lambros, 404 F.3d 1034, 1036 -1037 (8th Cir. 2005); Garrett v. U.S., 211 F.3d 1075, 1076 - 1077 (8th Cir. 2000).  When the court denies a petitioner's claim on procedural grounds without reaching the merits, the petitioner must demonstrate that reasonable jurists would find it debatable that a valid claim for the denial of constitutional rights has been stated and that the district court was correct in its procedural ruling. Slack, 529 U.S. at 484.

The Court will issue a certificate of appealability as to the juror misconduct issue raised in this motion, namely:

     A.     Whether defense counsel's failure to object to the Court's curative admonition constitutes ineffective assistance of counsel.

3.     The Court certifies that an appeal from the denial of this motion as to the juror misconduct issue may be taken in forma pauperis.

4.     The Court will not issue a certificate of appealability as to the jury instruction issue.  The Court certifies that an appeal from the denial of this motion as to the jury instruction issue may not be taken in forma pauperis because such a appeal would be frivolous and cannot be taken in good faith.  Coppedge v. United States, 369 U.S. 438, 444-45 (1962).  Based upon the entire record before the Court, dismissal of the motion as to the jury instruction issue is not debatable, reasonably subject to a different outcome on appeal, or otherwise deserving of further proceedings.  Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983).  Therefore, a certificate of appealability will not be issued by this court.[3]

If the Defendant desires further review of his motion as to the jury instruction issue he may request issuance of a certificate of appealability by a circuit judge of the Eighth Circuit Court of Appeals in accordance with Tiedeman v. Benson, 122 F.3d 518, 250-22 (8th Cir. 1997).

**IT IS SO ORDERED.**

Dated this 23rd day of October, 2007.

                           /s/ *Patrick A. Conmy*
                           Patrick A. Conmy, Senior District Judge
                           United States District Court

---

[3]The Court of Appeals for the Eighth Circuit has opined that the district courts possess the authority to issue Certificates of Appealability under Section 2253(c).  Tiedeman v. Benson, 122 F.3d 518, 522 (8th Cir. 1997).